Of Counsel:
SUMIDA AU & WONG
A Limited Liability Law Company

RECEIVED
CORPORATION COUNSEL
C AND C OF HONOLULU
*16 JUN 20 P2:14
PAUL S. AOKI
REFERRED TO

1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2016 JUN 17 PM 4:02

P. NAKAMOTO
CLERK

| KEVIN P.H. SUMIDA | 2544-0 |
| ANTHONY L. WONG | 6018-0 |
| LANCE S. AU | 6244-0 |
| STEPHEN K. ROY | 6184-0 |

735 Bishop Street, Suite 411
Honolulu, Hawai`i 96813
Telephone No. 808-356-2600
ksumida@hawaiilaw411.com; twong@hawaiilaw411.com

Attorneys for Plaintiffs LOUIS M. KEALOHA,
KATHERINE E. KEALOHA, and
KRISTINA KEALOHA, a minor child,
by her next friend,
KATHERINE E. KEALOHA

## IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

### STATE OF HAWAII

| | |
|---|---|
| LOUIS M. KEALOHA, KATHERINE E. KEALOHA, and KRISTINA KEALOHA, a minor child, by her next friend, KATHERINE E. KEALOHA,<br><br>Plaintiffs,<br><br>vs.<br><br>CHARLES W. TOTTO, individually and as Executive Director and Legal Counsel of the Honolulu Ethics Commission; LETHA A.S. DECAIRES, individually and as investigator for the Honolulu Ethics Commission; HONOLULU ETHICS COMMISSION; and THE CITY AND COUNTY OF HONOLULU,<br><br>Defendants. | CIVIL NO. 16-1-1166 -6 GWBC<br><br>(Non-Motor Vehicle Tort)<br><br>VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF; EXHIBITS 1-76; DEMAND FOR JURY TRIAL; SUMMONS |

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

Exhibit 1

## VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

Comes now plaintiffs above named, by and through their counsel, and for complaint against the defendants above-named, allege and aver as follows:

**THE PARTIES.**

1.      Plaintiffs LOUIS M. KEALOHA, KATHERINE E. KEALOHA, and KRISTINA KEALOHA are, and at relevant times were, residents of the State of Hawaii. KRISTINA KEALOHA, a minor child, brings this action by and through her next friend, KATHERINE E. KEALOHA.

2.      Defendant LETHA A.S. DECAIRES ("DeCaires") is, and at all relevant times was, a resident of the State of Hawaii.  Her actions which are the subject of the allegations herein took place in the State of Hawaii.  All actions and failures to act alleged herein on her part were performed and/or not performed while acting as an investigator for the Honolulu Ethics Commission.

3.      Defendant CHARLES W. TOTTO ("Totto") is, and at all relevant times was, a resident of the State of Hawaii.  His actions which are the subject of the allegations herein took place in the State of Hawaii.  All actions and failures to act alleged herein on his part were performed and/or not performed while acting as the Executive Director and Chief Legal Counsel of the Honolulu Ethics Commission.

4.      Defendant THE HONOLULU ETHICS COMMISSION ("Ethics Commission") is an agency of the City and County of Honolulu, State of Hawaii.

5.      The City and County of Honolulu is a municipal entity doing business in the State of Hawaii.

- 2 -

## OVERVIEW—CORRUPTION OF UNCHECKED POWER

6.      Totto and DeCaires have, since 2013 conducted a series of unfounded,
vindictive, unsubstantiated and illegal investigations of plaintiffs, at great cost to the
taxpayors and to the enrichment of at least DeCaires. Their actions caused, not only
significant financial loss to the taxpayers, but an immeasurable effect on the morale of
the City employees and community members who have witnessed such grotesque
abuses of power and process.  Exhibit 3.

7.      Defendants Totto and DeCaires have, by their improper and vindictive
actions, damaged the operations of the Honolulu Prosecutor's Office and the Honolulu
Police Department, the two entities of the City charged with enforcement of the laws of
the State of Hawaii and the City and County of Honolulu and protecting their citizens.
Making incessant demands upon these departments for documents and information of
questionable importance or even relevance, they have repeatedly imposed unnecessary
and frivolous burdens upon these departments in their futile quest to manufacture a
case against plaintiffs.

8.      Totto and DeCaires, charged with enforcing the ethical Standards of
Conduct applicable to all City and County employees, should be held to the highest
standards of ethical conduct and leadership, so that the public and County employees
will be able to have trust and confidence in the integrity of those in charge of policing the
ethical practices of the County's government agencies.

9.      With callous disregard for the lives and reputations of others, and the
demoralizing effect their vicious conduct has had on a number of County agencies and
employees, both Totto and DeCaires have to date committed serious ethical, moral and

professional violations with complete impunity.  These individuals have caused irreparable harm to the Honolulu Police Department, the Office of the Prosecuting Attorney, the hardworking men and women of the City and County of Honolulu, including the named plaintiffs in this matter.

10.     The chaos and dissention caused by Totto and DeCaires have negatively affected two of the State of Hawaii's most significant Departments tasked with assuring Public Safety and the implementation of Justice for our entire Community.  Given the level of destruction and terror caused by these flagrantly irresponsible individuals, the negative repercussions of their actions will be evident for some time.

11.     Over the course of his tenure as Executive Director and Legal Counsel for the Ethics Commission, defendant Totto has had virtually unrestrained power and authority, with little or no effective oversight from the Ethics Commission,  to initiate investigations, choose the targets and subjects of investigations (regardless of whether there was a factual basis therefor), control the scope and extent of such investigations, and determine when and if to charge City employees with violations of the applicable Standards of Conduct.

12.     As Executive Director and chief Legal Counsel for the Ethics Commission, defendant Totto has knowingly mislead and deceived the Commissioners of the Ethics Commission, who are unpaid volunteer public spirited individuals who receive no benefit for their services other than that which derives from service to the community.

13.     While such Commissioners are intended to provide oversight of the staff of the Ethics Commission, they must rely upon Totto, as Executive Director and Legal Counsel for the Ethics Commission, to properly advise them as to the applicable law

and procedures, including the laws and requirements governing the handling of investigations, and how and when notices of alleged violations of the Standards of Conduct are issued.

14.     With his claim of superior knowledge of the applicable laws and procedures, his ability to control the information provided to the Commissioners, and his ability, nurtured over the years, to leak information to his friends and sycophants in the media in order to obtain a favorable news story, Totto has, over the years, effectively undermined the power and prerogatives of the Board.

15.     The misapplication of the applicable laws and procedures of the Ethics Commission by defendant Totto has been so pervasive and well established as to become institutionalized and embedded in the actions and dispositions of, and by, the Ethics Commission.

16.     As a result, the processes and procedures of the Ethics Commission have been corrupted so that the instigation, handling, and dispositions of Ethics Commission investigations and prosecutions have for years been conducted in violation of the law, and in violation of required due process and proper procedures.

17.     Besotted by unchecked power, Totto abused his position to help himself and his friends and allies, punish his enemies and those who would not comply with his demands, exempt himself from the standards of conduct applicable to all other city employees, and terrorize city employees by way of disparate and inconsistent application of the Standards of Conduct.

18.     Totto's inconsistent and arbitrary application of the ethical standards violated, not only the very ethical standard he was required to enforce (such as RCH §

11-104) but other applicable laws and published opinions of the Ethics Commission of which he  was its Executive Director and Legal Counsel.

19.   Examples of Totto helping his friends and allies include:

**Whitewash of Questionable Conduct at the Board of Water Supply, and Witness Intimidation.**

20.   In advisory opinion number 2014-1, the Ethics Commission was asked to review potential ethical violations by Brian McKee, who was employed by the Board of Water Supply as its Chief Information Officer until May, 2011, and whose responsibility included creating and implementing plan to modernize business systems of the Board of Water Supply ("BWS").  Exhibits 6-22 pertain to the following allegations.

21.   McKee formed UTC-10 Consulting, LLC and as lead consultant in a consortium, successfully bid on a $1.5  million Water Master Plan contract.   After a "review" by Ethics Commission "staff," comprised of defendant Totto, no evidence of ethical misconduct was found despite the following:

a) McKee was undoubtedly involved in creating the specifications for the bids and had admittedly been "instrumental in providing an initial 'road map' for IT modernization," and had inside information as to the strengths and vulnerabilities of the information systems at the BWS;

b) UTC-10 was created in January, 2011, shortly before McKee left the employ of BWS;

c) On information and belief, once it awarded the contract to McKee, the BWS effectively would pay McKee, through his newly formed company, $1.5 million for work which McKee would have performed as an employee of the BWS as a salaried employee being paid $147,576.

d)  At least one member of the five member selection committee had worked as a subordinate to McKee only months before while McKee was at the BWS.

e)  The majority of the BWS selection committee staff stated that they had little or no formal procurement training.

f)  The applicable law, including ROH Section 11-105, prohibited any employee of the city from appearing for one year before any agency of the city or receive any compensation for any services rendered in behalf of any private interest in relation to any matter with respect to which such person was directly concerned, and the subject contract was awarded in June 2012, and the bid process was posted on May 22, 2012, only two days after McKee's departure from the BWS, and the advisory opinion number 2014-1 curiously omits any discussion of this timetable.  Instead, defendant Totto, as Executive Director and Legal Counsel, came to the conclusion, a conclusion which was intentionally wrong, that the law did not prohibit such conduct.  In coming to this wrongful conclusion, Totto intentionally ignored prior Ethics Commission opinions, including Advisory Opinion No. 242, which states that "former officers and employees are required to wait one year after terminating their relations with the City before being employed by private interest to work on any case, proceeding or application with which he or she previously was involved in any way on the City's behalf."

- 7 -

22.     McKee's company, UTC, was also the successful bidder for a Contract for Project Management for Computerized Maintenance Services, in the amount of $950,000. After a so-called "review" by Ethics Commission "staff," comprised of defendant Totto, no ethical misconduct was found despite the following:

a)  McKee was undoubtedly involved in creating the specifications for the bids and had admittedly been "instrumental in providing an initial 'road map' for IT modernization," and had inside information as to the strengths and vulnerabilities of the information systems at the BWS

b)  At least two of the three member selection committee had worked as a subordinate to McKee only months before while at the BWS.

c)  The majority of the BWS selection committee staff stated that they had little or no formal procurement training.

d)  The applicable law, including ROH Section 11-105, prohibited any employee of the city from appearing for one year before any agency of the city or receive any compensation for any services rendered in behalf of any private interest in relation to any matter with respect to which such person was directly concerned, and the subject contract, like the Water Master Plan contract, was awarded in June 2012, and the bid process was posted on May 22, 2012, only two days after McKee's departure from the BWS, although the advisory opinion number 2014-1 curiously omits any discussion of this timetable. Again, defendant Totto, as Executive Director and Legal Counsel, intentionally and wrongly concluded that the law did not prohibit such conduct, even though such a conclusion is contradicted

by prior Ethics Commission opinions, including Advisory Opinion No. 242, which states that "former officers and employees are required to wait one year after terminating their relations with the City before being employed by private interest to work on any case, proceeding or application with which he or she previously was involved in any way on the City's behalf."

23.    McKee had been an employee of EMA, Inc. to be the chief information officer for the BWS, but later became a direct employee and the CIO of the BWS in 2003.  In 2008, BWS and McKee's former EMA entered into a Contract for Customer Information System Project Management Services in the original amount of almost $800,000, which later increased almost six-fold due to "change orders".  After a so-called "review" by Ethics Commission "staff," comprised of defendant Totto, no evidence of ethical misconduct was found despite the following:

a) The original contract with the BWS was for almost $800,000, but as a result of 11 "change orders," the contract ballooned to $4.2 million, and while it was originally intended to be an 18 month contract, it continued for years.

b) Julie McKee, the wife of Brian McKee, was also a member of UTC-10 Consulting, LLC and having the same address as Brian McKee, and was formally associated with EMA in 2004, 2005, 2006, 2007, 2008.

C) The signator to the 2002 Application for Certificate of Authority to allow EMS, a Minnesota company, to do business in Hawaii, as well as various board members of EMS, shared the same business address as Julie McKee.

24.     There was much public interest in the apparent illegal and unethical practices at the BWS, but Totto did not perform more than a perfunctory investigation, and did not refer the matter to law enforcement.

25.     The advisory opinion written by Totto, which concluded that no ethical violations occurred, would normally be non-public, and the individual who was the subject of the report would normally be kept confidential, since no violations were found. Yet in an unprecedented and very deliberate move, McKee waived his confidential privacy right, in order for Totto's approval of his conduct to be made public, thereby whitewashing the matter, and effectively squelching further scrutiny.

26.     In addition, Totto and DeCaires used the ostensible BWS investigation to identify the whistleblowers' sources, and, with the intent to threaten and intimidate the BWS whistleblowers, launched an improper ethics investigation against the whistleblowers.  As intended, this prevented further whistleblowing. However, the complaints of the whistleblowers brought to light issues which subsequently lead to cancellation of the contracts.

27.     Totto's motivations for taking the above actions, and any financial connections to McKee, may have been more apparent had Totto filed public financial disclosures as required by law.  However, Totto has, improperly exempted himself from this legal requirement, and has refused and failed to file public financial disclosures.  By exempting himself from this requirement, Totto has violated the ethical proscriptions found in RCH Section 11-104 which prohibits him from giving special consideration, treatment, advantage, privilege or exemption to himself or any person beyond that which is available to every other person.

**Whitewash Of "Illegal" Action Of The Mayor.**

28.    In 2011, the then-mayor, Peter Carlisle, sought an opinion from the Ethics Commission as to whether he had to repay funds used to pay for the travel expense of the Mayor's wife.  The funds were part of a larger gift to the City by a foreign donor, and accepted by the City Council.  Exhibits 25, 26.

29.    Peter Carlisle is a personal friend of Totto, and, after leaving office, has acted as Totto's attorney in various civil matters. Exhibits 25, 26.

30.    The law was unescapably clear, and Totto could not avoid the conclusion that the use of such funds was prohibited, and that it would be unlawful for the Mayor to retain the use of such funds after spending it on travel for his wife.  After "commending" the Mayor for bringing the issue to the attention of the Ethics Commission, Totto "recommended" that the Mayor return the funds to the City.

31.    While having no choice as to the conclusion of illegality, Totto then did something completely unprecedented: he gave his friend a way out by offering suggestions as to how the situation could be remedied in several ways, including seeking approval by the City Council for special and unique permission, *ex post facto*, to allow the Mayor to keep the funds.  Exhibits 26, 26.

32.    As suggested by Totto, the Mayor sought, and obtained, such approval from the City Council, and accordingly did not have to repay the funds used for his wife's travel.  Exhibits 25, 26.

33.    Totto's exceptional response to the Mayor's request for advice stands in sharp contrast to the disparate treatment given to others, such as:

   a.  The response to Councilmember Nester Garcia, who, after submitting a request for advice to Totto, was not "commended" for bringing the matter to Totto's attention, but was instead subject to investigation and significant punitive action by Totto;

   b.  The response to plaintiff Katherine Kealoha, who, after submitting a request for advice to Totto, received no advice and no substantive response from Totto, but instead was subjected to multiple, expansive, and vindictive investigations by Totto and DeCaires. Exhibits 27, 69.

34.   Such action by Totto constitutes a violation of the ethical proscriptions found in RCH § 11-104 which prohibits him from giving special consideration, treatment, advantage, privilege or exemption to himself or any person beyond that which is available to every other person. Exhibits 26, 62, 63, 65, 29, 58.

**Improper Favoritism, Patronage, And Use Of City Resources.**

35.   Bypassing normal hiring and procurement requirements, Totto hired a family friend to fill a position at the Ethics Commission.  Such action violated ethical proscriptions discussed in Ethics Opinions authored by Totto himself, prohibiting patronage and favoritism, as well as RCH § 11-104.  Exhibit 28.

36.   Thereafter, Totto used official Ethics Commission letterhead to write a letter of recommendation on behalf of the family friend for a position with the Hawaii State government. Such action violated ethical prohibitions against the use of City letterhead for non-governmental purposes.  This very prohibition was discussed an

ethics opinion authored by Totto himself three years earlier, wherein he chastised an

employee for using City letterhead to write a letter of recommendation.  Exhibit 28.

### Circumvention of hiring and procurement laws.

37.     So as to not jeopardize DeCaires' retirement benefits, Totto sought and

obtained approval from the Ethics Commission to give a series of 89 day contracts to

DeCaires.  The contract was renewed many successive times, which gave DeCaires the

virtual benefit of a permanent, full time position, but without loss of her retirement

benefits.  Exhibit 29.

38.     Even if the use of multiple renewals of what is supposed to be a single

short term contract is technically within the bounds of the law, it was not ethical for an

employee of the Ethics Commission to do so, and it violated the spirit and intent of the

applicable laws pertaining to hiring and procurement.  On information and belief, Totto

continued to seek renewals of DeCaires contract, and also promoted her, making little

or no effort to find a qualified and full time investigator, and/or claimed that there were

no qualified individuals available.  This allowed DeCaires, with the full approval and

ratification by Totto, to continue her improper investigations using inside information she

obtained while working for HPD, by making false statements and/or manufacturing

evidence, disclosing confidential and protected information, and disregarding the

requirements and protections of the law.  Id.

### ABDICATION OF AUTHORITY BY THE ETHICS COMMISSION

39.     By allowing and delegating authority to Totto to define for himself the

scope and application of the laws and procedures of the Ethics Commission, to

determine at his whim which persons or matters were to be investigated, and the scope

and scale of such investigations, the Ethics Commission has perpetuated longstanding illegal practices and customs which have, in effect, constituted its standard operating procedure.

40.     In doing so, the Ethics Commission has given defendant Totto, as its Executive Director and Chief Legal Officer, carte blanche ability and authority to act without meaningful oversight, and allowed his overreaching and illegal actions to effectively constitute official policy of the Ethics Commission.

41.     Further, by participating in wrongful and illegal prosecutions of city employees orchestrated by Totto, the Ethics Commission has effectively ratified the illegal and wrongful decisions and actions of Totto and DeCaires.

42.     For years, Totto has maintained a "Trophy Board" upon which he posted the pictures and names of certain City officials and employees whom he "bagged" for ethics violations.  It was an updated board, with the names and pictures of City employees whom he had determined "violated" City ethics rules.  Exhibit 31.

43.     Having no purpose but to shame others, Totto would take this Trophy Board to seminars and presentations conducted under the auspices of the Ethics Commission, singling these employees out for special public humiliation and approbation, and to brag about having prosecuted them for putative ethics violations. Indeed, when making presentations to city employees, he would often refer to his Trophy Board as his "Wall of Shame."

44.     Totto was less interested in educating city employees as to their ethical requirements, than in creating a reign of terror. This had the effect of squelching criticism of him, and preserving his job security despite his own numerous and

significant ethical violations, improper disclosures of confidential information, and illegal investigations.  See Exhibit 30.

45.    Louis Kealoha attended a mandatory Ethics training class, with possibly over fifty other City employees, and he was dismayed and appalled by Totto's use of this "Wall of Shame" Board.  He had indicated to others that this was wrong and unnecessarily humiliating to people.  On the same rationale, he had earlier caused the HPD to remove its website which identified persons who had been arrested for DUI.

46.    After being informed of a new Ethics training class to be given by Totto, plaintiff Louis Kealoha contacted the City Managing Director and explained to him Totto's "Wall of shame" was no different from a modern day Scarlet Letter, with no other purpose than to humiliate others.  Louis Kealoha told the Managing Director that if Totto brought that Board to the upcoming training, he would state his objection out loud and walk out.

47.    As a result, Totto did not bring his Trophy Board to subsequent Ethics training sessions. Totto was clearly embarrassed by plaintiff's complaint to the Managing Director, and has since then schemed to exact his revenge.

48.    Totto continues to use a different version of his Trophy Board, such as a cartoon drawing of a City bus with occupants as the ethics offenders, continuing to try to hold them up to shame and ridicule.  Exhibit 31.

49.    Totto and DeCaires have conducted the ethics training in various city departments, but instead of education and information, the focus of such training has been to intimidate and instill fear with threats of seizing employee's computers, "reviewing all employees emails," and "initiating large investigations," on those

employees that did not "comply" with his ethics directives, and ever increasing fines for those who did not quickly cooperate.  Exhibits 40, 70.

50.     Further, by virtue of his position as the gateway to all investigations and prosecutions for ethical violations, Totto effectively exempted himself from the requirements of the Standards of Conduct, and has knowingly violated Standards of Conduct with impunity, while similar violations by other City employees have been vigorously prosecuted and resulted in fines and sanctions.  To wit:

a. While prosecuting and shaming others for the private use of City resources, Totto knowingly used his official letterhead to write a letter of recommendation for a candidate for State judicial office, a clear violation of the Standards of Conduct.  In fact, Totto had himself authored at least two advisory opinions, which stated that it is a clear violation of the standards of conduct to use city resources, including agency letterhead stationery signed in an official capacity, to write a letter in support of a matter which is unrelated to the officer's official duties.  Exhibit 30.

b. Totto, the Executive Director of the Honolulu Ethics Commission, has never filed a public financial disclosure form, despite the clear requirement of the law, including ROH § 3-8.4(e), which requires public filings for all directors and first deputies of all city agencies. Exhibits 24, 30.

c. Totto has made numerous disclosures to third parties and the news media of confidential information, in violation of the applicable laws

and procedures of the Ethics Commission.  Exhibits 32, 55, 72, 74, 76, 42.

d.  During various investigations aimed at plaintiff Katherine Kealoha, personnel at the Honolulu Prosecutor's Office were hounded and harassed by Totto and DeCaires for private and confidential information of plaintiff Katherine Kealoha, to which by law, they were not entitled.  As a result of such aggressive and relentless hounding, Totto and DeCaires were able to obtain confidential information of plaintiff Katherine Kealoha in violation of rights protected by law.  Exhibits 26, 42, 74, 75.

e.  When Totto was asked to justify his need for various documents and information being requested about plaintiff Katherine Kealoha, he repeatedly stated that he was prohibited by law from giving witnesses details about their investigations.  Exhibit 32.  Yet, when convenient to their purposes, Totto and DeCaires repeatedly and improperly provided detailed, and often false, information to third parties, including persons interviewed by them, as well as individuals that worked directly with both adult plaintiffs.  Totto and DeCaires also repeatedly and improperly leaked such information to the media.

51.  Totto also sought to target plaintiffs because he perceived them to be aligned with Corporation Counsel Donna Leong, of whom Totto was openly

contemptuous and resentful, because Leong sought to control Totto's indiscriminate and improper leaks and public pronouncements to the media.  Exhibit 32 33.

### TOTTO'S RETENTION OF DEFENDANT DECAIRES DESPITE HER QUESTIONABLE HISTORY AND CLEAR CONFLICTS OF INTEREST.

52.    Defendant DeCaires was hired by defendant Totto and specifically assigned to investigate plaintiffs in what was a selective and directed effort to "bag" the plaintiffs, against whom he could extract his revenge, and, as a bonus, add two prominent and noteworthy employees to his Trophy Wall "Of Shame".

53.    While particularly capable of engaging in boundless investigations unconstrained by the law, as was intended by Totto, DeCaires was also particularly unfit to perform any such investigation in a neutral and unbiased manner.

54.    DeCaires has a well-known history of being too willing to ignore the constraints of the law, and of being too willing to pervert the law and lawful procedures in order to achieve her goals.  Exhibit 34.

55.    While DeCaires was employed by the Honolulu Police Department, she directed an investigation, confinement and prosecution of an individual, Mansour Arekat, that was plainly illegal and unconstitutional, and resulted in a successful lawsuit brought against the City and County of Honolulu for civil rights violations, arising from what had been characterized as a "bogus HPD bust."

56.    The violation of civil rights by DeCaires was so clear and egregious that the Ninth Circuit Court of Appeals ordered that liability be established as a matter of law, setting aside a trial verdict, leaving only the question of damages. The City and County of Honolulu eventually paid almost a quarter of a million dollars to that plaintiff in a highly publicized settlement. Exhibit 34.

57.     Subsequent to her participation in the Arekat disaster, DeCaires unsuccessfully competed for the position of Police Chief, and was greatly disappointed when plaintiff Louis Kealoha instead was named to this position.

58.     DeCaires also sought, but was denied, a promotion to Major during the administration of plaintiff Police Chief Louis Kealoha.

59.     DeCaires later retired from the HPD, embittered and under a cloud of failures.  When she left, she made it clear to many at HPD that she was very unhappy with how she had not received the promotions she believed she was owed.

60.     DeCaires later applied for a position with the Honolulu Prosecutor's office while plaintiff Katherine Kealoha was part of the Prosecutor's management team.  She was not hired.

61.     Decaires also applied for a Chief of Police position in Pierz County, Minnesota, at a salary level a fraction of any comparable position in Honolulu.  She was unsuccessful in this effort as well.  Exhibit 36.

62.     That DeCaires had an actual conflict of interest in investigating the plaintiffs was apparent from the above, and this was pointed out to Totto.  Totto was also repeatedly reminded of his own public statements to the effect that "if there merely is an appearance that there is a conflict of interest, then it is a conflict."  Exhibits 37, 39.

63.     Further, as Executive Director of the Ethics Commission, Totto was well aware of DeCaires' prior questionable history and methods of doing her job, which previously caused the City and County of Honolulu to pay significant sums to settle the claims of Mr, Arekat for violation of his civil rights by DeCaires.  Exhibit 34.

64.     Nevertheless, despite the clear conflict of interest on the part of DeCaires, and despite the fact that DeCaires was clearly incapable of properly performing her job and too invested in retribution to perform any investigation of plaintiffs with objectivity, and despite the fact that DeCaires had a history of conducting questionable and illegal investigations, Totto knowingly hired, and continued to retain, DeCaires. In fact, he aggressively fought for her position to be upgraded from an Investigator II position to an Investigator III position, which significantly increased her pay.   Exhibit 29.

65.     When funding for her position was exhausted, Totto somehow found additional funds to continue to retain DeCaires to specifically investigate the plaintiffs in her many bogus investigations.

66.     In doing so, Totto knowingly hired, ratified, promoted, and continued to retain DeCaires, with full knowledge of her improper motives and methods, and indeed knowingly encouraged her to continue her vindictive and illegal investigations of plaintiffs.

### TOTTO AND DECAIRES FOCUS UPON PLAINTIFFS

67.     Between 2011 and 2013, the adult plaintiffs were engaged in a heated dispute with the Board of Water Supply, based upon outrageous high invoices, sometimes 100 times or more the normal water bill, generated by the BWS's flawed billing system, as well as multiple wrongful debits to plaintiff's checking account, and multiple failures to credit prior payments.  Exhibit 23.  Hundreds of other BWS customers were also victims of similar significant billing errors.

68.     Plaintiff Katherine Kealoha wrote letters and met in-person with various BWS executives and employees, who reacted with threats and intimidation.

69.     Plaintiff Louis Kealoha also attempted to address the situation with BWS Executives, without success, and was instead provided false information and asked to "look the other way."

70.     After plaintiff Katherine Kealoha threatened to complain further about the grossly deficient BWS billing system and the apparent indifference of the BWS executives to the problem, the following occurred:

> a. Various BWS executives, including BWS Board member Adam Wong, suggested that plaintiff would regret taking any action, and that she did not know whom she was dealing with.
>
> b. Like the BWS whistleblowers discussed *infra*, plaintiffs suddenly became the subjects of multiple investigations by Totto and DeCaires.

**DEFENDANT'S WRONGFUL INVESTIGATIONS**

71.     DeCaires and Totto have maliciously and in violation of both the law and procedures of the Ethics Commission, engaged in a course of conduct which was designed, not to investigate valid complaints, but to hunt for ethical violations on the part of the plaintiffs without reasonable cause to believe that violations had occurred.

72.     Totto and DeCaires repeatedly and intentionally deceived the members of the Ethics Commission as to the scope, breadth and complexity of the "alleged ethics investigations" that they were conducting on the adult plaintiffs, as well as their friends and family members.

73.     To suit his need, justify his investigations of plaintiffs and to obtain continual funding for DeCaires' contract, Totto would refer to his investigations of

plaintiffs as simple and straightforward, and alternatively, as it suited his needs, as

highly complex and extensive.

74.     For example, after being repeatedly warned (Exhibits 40, 43, 44) by

Corporation Counsel that Totto and DeCaires were operating outside of the scope of the

legal jurisdiction of the Ethics Commission, Totto would refer to the investigation of the

adult plaintiffs as a very simple and straightforward case.  But, when seeking additional

resources, justifying the continued need for DeCaires, or disclosing confidential

information to outside sources, Totto would refer to the same investigation as very

complex, claiming it involved 16 or 17 separate investigations and two city departments,

as well as interviews of some 200 witnesses.  Consistent with his latter assertion but

inconsistent with the former, when Totto submitted a proposed witness with respect to a

contested hearing involving the plaintiffs, he listed some 86 witnesses.

75.     In an attempt to justify and show results for his investigations of plaintiffs,

Totto hurriedly prepared and filed against the adult plaintiffs improper Notices of Alleged

Violations of the standards of conduct.  The said notices were made in violation of the

laws and applicable procedures of the Ethics Commission.  They were prepared and

filed by Totto for improper and malicious purposes, and based upon justifications and

standards which were arbitrarily and capriciously applied, and which were contradicted

by prior Ethics opinions which he himself authored.  Plaintiffs contested the notices of

violations and requested a full hearing on all matters.

76.     Totto's dissembling as to the scope and nature of the investigations of

plaintiffs, and his resulting juggling of two diametrically opposite characterizations of the

investigations to suit his needs, could not be sustained.  Once the actual facts of the

matters began to be exposed to the Ethics Commission members, Totto was unable to maintain his convenient fictions, and both he and his stories collapsed under the weight of his own deceptions.  Thereafter, Totto abruptly went out on "medical leave," completely unable to meet any of the previously established deadlines or attend further hearings in the contested case.

77.     Once provided with the facts and circumstances known by plaintiffs of Totto's improper conduct, the Ethics Commission disqualified Totto from the contested case and canceled as moot the hearing scheduled to consider his disqualification. Outside counsel was thereafter appointed to replace Totto as legal counsel in the contested case.

78.     Moreover, despite the fact that Totto had been notified of significant reasons why DeCaires had a conflict of interest in investigating plaintiffs, and despite there being significant evidence of abusive investigation tactics undertaken by DeCaires, Totto refused to acknowledge DeCaires' conflict of interest, refused to recognize her unsuitability for her role, and in fact repeatedly caused her 89 day contracts to be renewed in order for her to continue her wrongful investigations of plaintiffs.  In doing so, he knowingly and expressly approved and ratified the actions of DeCaires.

79.     Documented requests that DeCaires should be conflicted out of the investigations of plaintiffs were made on multiple occasions by both adult plaintiffs, as well as by Legal Counsel for HPD, by Prosecutor Keith Kaneshiro, and by attorneys for plaintiffs.  Multiple reasons were cited and documented, but Totto refused to

acknowledge the conflict, despite his own oft-repeated advice that "if there is a mere appearance of a conflict, then there is one." . Exhibits 37-39.

80.     In her unlawful zeal to create any ethical violation whether real or manufactured, and as evidence of her conflict of interest and improper motives, and with the full approval of and ratification by Totto, DeCaires violated the rights of HPD officers, witnesses and the plaintiffs, provided false and defamatory information to witnesses and others, violated *Garrity* rights of witnesses and plaintiffs, violated the laws and procedures of the Ethics Commission, shared confidential as well as fabricated information with others, and improperly caused the adult plaintiffs to be involved in other proceedings and investigations, all while continuing to benefit from the continued renewal of her 89 day contracts.  Exhibit 41.

81.     The bogus investigations by DeCaires under the auspices of the Ethics Commission and specifically approved by Totto, were allowed to multiply and spun off into many wrongful investigations, including investigations into areas of which the Ethics Commission had no jurisdiction, including but not limited to departmental management matters.  In addition to furthering their unlawful goals, this scheme had the further effect of justifying the more than seven renewals of DeCaires' 89-day contract, as well as the increases in her pay grade during the same time period.  Exhibits 43, 44.

82.     In the course of proceedings held in the contested case, it became clear that the Commissioners of the Ethics Commission had no knowledge of how out-of-control Totto and DeCaires had been in the course of these bogus investigations.  With this realization, Ethics Commission unanimously voted to settle the contested case and dismiss the matters against the adult plaintiffs on the very same day.

83.     The process and procedures of the Ethics Commission have been so corrupted that the instigation, handling, and dispositions of Ethics Commission investigations and prosecutions have for years been conducted in violation of the law, without following proper procedures.

84.     DeCaires and Totto engaged in far reaching, extensive and disruptive investigations which were designed to disrupt, poison the minds of witnesses and harass rather than reveal, all causing damage to basic rights of the plaintiffs and others. Illegal investigations and actions by DeCaires and/or Totto included:

a)  So-called "interviews" of witnesses by DeCaires, where the witnesses were asked few real questions, and instead were provided knowingly false and defamatory "facts" which was intended to, and did accomplish, disruption to plaintiff Louis Kealoa's command, to plaintiff Katherine Kealoha's work place, and to the minor plaintiff's school environment, as well as damage their professional standing and reputations.  Exhibit 42.

b)  Making knowingly false statements  by DeCaires in one or more sworn declarations filed with the Ethics Commission, including her false claim that plaintiff Louis Kealoha was a subject of an ethics investigation in 2013.  Exhibits 46, 62.

c)  Making knowing false statements by Totto to his attorney that plaintiff Katherine Kealoha had previous ethics violations.  Exhibits 30, 59.

d)  When DeCaires and Totto learned that an employee of the Honolulu Prosecutor's office had attended a portion of a civil lawsuit in which plaintiff Katherine Kealoha was a defendant (and which she ultimately

prevailed in its entirety), they immediately concluded, with no basis to support such a conclusion, that the employee must have done so on City time.  Rather than simply contacting the employee to determine whether leave was taken or simply reviewing the time records of the employee to confirm that the employee took personal leave to attend the civil trial, which would have confirmed that the employee had not taken any City time to attend the trial, DeCaires and Totto opened an extensive investigation, repeatedly contacting various members of the Administration of the Prosecutor's office, calling into questions the integrity and ethics of the employee, badgered and questioned multiple witnesses, sought extensive records of the Prosecutor's office, and openly and wrongfully accused the employee of abusing City resources, with no valid basis therefor.  Exhibit 3.

e)  When certain witnesses to an investigation did not give DeCaires and Totto the "desired" testimony, even though such desired testimony was not true, they vindictively and illegally opened separate investigations of the witnesses in an attempt to dredge up an ethics violation, in violation of the law and procedures applicable to the Ethics Commission.  Id.

f)  Because they did not like the answers provided by witnesses who were relatives of plaintiffs, DeCaires and Totto, with the intent to harass and intimidate the witnesses, launched an extensive and illegal investigation into whether the relatives were in violation of a particular Standard of Conduct prohibiting gifts to City employees by living rent-free on the

plaintiff's property, despite a clear provision in the law which exempted

relatives from the prohibition.  Id.

g) DeCaires and Totto launched an investigation into whether it was

improper for a an officer to accept, on behalf of his division, an authorized

and finance approved, donated carpet section and refrigerator to be used

in an HPD common area.  Id.

**WRONGFUL INVESTIGATION PERTAINING TO GERARD PUANA.**

85.    Totto and DeCaires launched an investigation of a criminal matter

involving plaintiff Katherine Kealoha's uncle, Gerald Puana.  In the criminal matter,

Puana was arrested for unauthorized entry into a neighbor's house.  Plaintiff Katherine

Kealoha had no involvement with the handling of the case by the Honolulu Prosecutor's

Office because the matter was assigned to another division which was not supervised

by her.  Exhibit 71.

86.    As his niece, plaintiff Katherine Kealoha posted bail for Puana following

his arrest.  Exhibit 71

87.    Plaintiff Katherine Kealoha also posted bail for Puana in other traffic

matters.  Id.

88.    Puana has never reimbursed plaintiff for any of the bail expenses, and she

has not asked him to do so.

89.    Such criminal matters were outside the scope of the jurisdiction of the

Ethics Commission.   Exhibits 43, 44.

90.    Totto and DeCaires launched an improper investigation of the Puana

matter.

91.     Totto and DeCaires falsely concluded that the assignment of the criminal matter to another division in the Prosecutor's Office was due to a civil lawsuit between Puana and Kealoha.  But the civil lawsuit occurred much later, in 2013.  In 2011, the parties were still on good terms.  This is evidenced by cordial and happy emails Puana sent to Kealoha in June of 2011, discussing matters such as Puana's partner who lived with him at their Aunty Rose's house, and his ventures in Waimanalo.

92.     In 2011, Puana voluntarily submitted himself to drug rehabilitation at the Sand Island Treatment Center, which does not accept a patient unless the patient voluntarily checks in.  Puana admitted under oath that he listed Kealoha, not his mom or his brothers and sisters, as his emergency contact.  In fact, plaintiff Katherine Kealoha was the only one in the family who was willing to post Puana's bail and bring him the personal hygiene items he needed while he was at the treatment center.  Plaintiff went to Puana's mother's house, at Puana's specific request, to retrieve personal items he requested.  Other personal and hygiene items were purchased by plaintiff Katherine Kealoha at her expense.  Puana himself admitted that, while at the treatment center, he never made negative comments about plaintiff Katherine Kealoha.  Exhibits 43, 44.

93.     Accordingly, Totto and DeCaires could not reasonably conclude that the criminal prosecution of Puana and any related activity on the part of plaintiff Katherine Kealoha was due in any part to any dispute or bad feeling between Puana and Kealoha, since, as noted above, the parties' falling out and subsequent civil lawsuit occurred only years later, that the evidence existing at the time of his arrest shows that they were on good terms at the time, that Kealoha had no involvement in the prosecution of the criminal matter, that Kealoha provided bail money for Puana, that she bought and

provided him his personal and hygiene items when he voluntarily checked into the treatment center, and that he named her and not any immediate family members as his emergency contact at the treatment center.

94.    In addition, the Ethics Commission had no jurisdiction over any aspect of the said matters, and it was therefore improper for Totto and DeCaires to expend City resources investigating such matters.

### DECAIRES' EFFORTS TO MICROMANAGE THE HONOLULU POLICE DEPARTMENT.

95.    Frustrated by her failed opportunity to run HPD as its chief, DeCaires, with Totto's approval, utilized the investigative powers of the Ethics Commission to try to run HPD from her armchair investigator's position, by questioning management decisions of HPD under the guise of an "ethics investigation" even though the Ethics Commission should have no authority, or interest, in such management decisions.  Exhibits 57, 66, 75.

96.    For example, DeCaires and Totto launched an investigation into whether it was "ethically" improper for the Chief of Police, as part of his management prerogative, to designate the HPD officer who would be allowed to attend the FBI National Academy training on the mainland.  Such an investigation was instituted, and conducted by Totto and DeCaires, in violation of the applicable laws and procedures.  Exhibit 3.

### WIDE RANGING ABUSIVE AND EVER EXPANDING INVESTIGATIONS

97.    In all, Totto and DeCaires have, to plaintiffs' knowledge, launched at least 19 separate investigations, including vindictive investigations against plaintiffs and retaliatory investigations against witnesses who they deemed to be "uncooperative". Exhibit 3.

98.     All investigations were instituted illegally, in violation of the applicable laws and procedures of the Ethics Commission, and with improper intent.

99.     These illegal and improper investigations resulted in no discovery of any violation of the Standards of Conduct.  Exhibit  37, 30, 42, 32, 45, 47, 48, 49, 50, 51, 52, 53,54, 55, 61, 62, 67.  But in the course of these illegal investigations:

a) Totto and/or DeCaires deliberately made false and defamatory statements about plaintiff to third parties, with the purpose and effect of placing plaintiffs in a false light, damaging the personal and professional reputations of plaintiffs, and causing such third parties to question the integrity of plaintiffs.  In some instances, employees under the command of plaintiff Louis Kealoha, transferred out of specific divisions or retired, rather than work under one whose integrity was called into question by the Ethics Commission investigator;

b) Employees under the command of plaintiff Louis Kealoha were specifically targeted and harassed by the DeCaires, simply because they were unwilling to "lie" and "create false claims," against the Plaintiffs as Totto and DeCaires implied;

c) Totto and/or DeCaires deliberately made false and defamatory statements about plaintiff to other state and federal agencies, for the purpose and with the effect of causing plaintiffs to be embroiled in litigation and/or adversary actions by such agencies and/or to

create a conflict of interest which would disqualify such agencies
from investigating the defendants themselves;

d) Totto and/or DeCaires deliberately and improperly leaked
confidential and false information to the federal authorities and to
the federal public defender;

e) Totto and/or DeCaires deliberately and improperly leaked
confidential and false information to the media.  In some instances,
the media was informed about Ethics Commission investigations
only days after defendant DeCaires was assigned to the matter
Exhibits 52-55.;

f) Totto and/or DeCaires deliberately disrupted and harassed the
Prosecutor's office and interfered with the orderly operation of that
office Exhibits 3, 74;

g) Totto and/or DeCaires disrupted and interfered with plaintiff Louis
Kealoha's command, and interfered with the orderly operation of
the HPD, Exhibits 3, 62, 57.;

h) Totto and/or DeCaires intentionally interfered with existing
contractual relationships of the plaintiffs, including but not limited to
their contracts of employment. For example, defendant DeCaires
improperly obtained a copy of plaintiff Louis Kealoha's contract with
the City from the Honolulu Police Commission and thereafter
attempted to intimidate the Police Commission's chairman to cause
plaintiff to be terminated, , Exhibits 67, 71, 72, 75;

i)   Totto and/or DeCaires disrupted and interfered with plaintiff

Katherine Kealoha's work, hampered her ability to perform her job,

hampered her ability to properly supervise other prosecutors, and

impeded the investigation and prosecution of important cases,

Exhibit 64;

j)   Totto and/or DeCaires deliberately harassed and bullied employees

of both the Prosecutor's office and HPD, Exhibits 68, 71, 72, 73, 75,

76;

k)   Totto and/or DeCaires deliberately harassed and bullied members

of the Police Commission, specifically threatening the chairperson

of the Police Commission with false claims of non-existent conflicts

of interest to improperly attempt to remove him from evaluating

plaintiff Louis Kealoha, including threats to fine him with "larger

fines" if he did not bow to their wishes.

l)   Totto and/or DeCaires deliberately, improperly and illegally shared

with other state and law enforcement agencies information provided

plaintiffs, by witnesses, by HPD officers, and by other County

employees, in violation of their Garrity and other rights.  The

violations were so systematic and egregious that, in an

unprecedented move, the State Of Hawaii Organization of Police

Officers ("SHOPO") filed a formal union grievance, stating that HPD

officers were being compelled to appear before the Ethics

Commission "to answer questions without being informed of the

allegations made against them or being afforded the opportunity to view the complaint," and were "not being afforded any Garrity Rights prior to being compelled to answer questions."  The police union expressly found that "the Ethics Commission, a department of the City and County of Honolulu is in violation of [the Collective Bargaining Agreement]," Exhibits 41, 45, 51, 47, 48, 49, 51;

m) Totto and/or DeCaires deliberately, improperly and illegally shared with third parties, including the attorney for Gerard Puana, information provided plaintiffs, by witnesses, by HPD officers, and by other County employees, in violation of their Garrity and other rights, Exhibits 51, 60;

n) Totto and/or DeCaires deliberately and/or knowingly interfered with, caused damage to, plaintiff's prospective economic advantages.

100.    While criticizing and even prosecuting others for misuse of city resources, defendants Totto and DeCaires, in their blind fervor to add plaintiffs to Totto's Trophy Wall, misused city resources to re-investigate matters which had been fully adjudicated in separate civil proceedings, and about issues which were not within the jurisdiction or purview of the Ethics Commission Exhibits 42-44, 60.

**IMPROPER AND FALSE DISCLOSURES AND VIOLATION OF CONFIDENTIALITY.**

101.    Totto and DeCaires misused their positions to knowingly violate the clear confidentiality provisions of the law and procedures of the Ethics Commission, in order to obtain advantage for themselves and/or effect results not pertaining to the goals and functions of the Ethics Commission.  Such violations include:

a) Disclosure of false information to State taxing authorities under the auspices of the Honolulu Ethics Commission, which caused plaintiffs to be subject to audit requests by the State. After the requested information was provided by plaintiffs to the taxing authorities resulting in the plaintiffs' complete exoneration, a representative of the taxing authority indicated that they had never before received such false and material information from a fellow governmental agency, Exhibits 32, 67;

b) Continuous leaking of confidential information to the news media. For example, they leaked information about HPD officers being subpoenaed to testify at a closed hearing of the Ethics Commission, and falsely informed the news media that plaintiffs were seeking to question "whistleblowers" in an upcoming hearing in the contested case. But in fact, while subpoenas were issued by the Ethics Commission at the behest of the plaintiffs, none of the HPD officers were "whistleblowers," and none of the HPD officers were ever served with the subpoenas. The hearing itself was later cancelled because it was deemed moot when Totto was disqualified from the case. No one outside of the Ethics Commission staff knew of these subpoenas, and so the news media could not have known that HPD witness were subpoenaed and not served, but for the leaks by Totto and/or DeCaires, Exhibits 30, 52-55;

c) Making false and unauthorized disclosures to third parties of information about plaintiffs for the purpose of obtaining a personal advantage.  For example, in an effort to quash plaintiffs' complaints against him for his own ethical violations, Totto hired a private attorney to represent his personal interests, and in the process offered to dismiss a single pending ethics complaint which he filed against each plaintiff in his official capacity as Executive Director of the Ethics Commission, in exchange for their withdrawal of eight pending ethics complaints which had been filed against him personally, Exhibits 30, 49, 50, 61.

d) Further, Totto falsely and maliciously informed his personal attorney that plaintiff Katherine Kealoha had been previously found to have violated the Standards of Conduct, in order to leverage his personal position, Exhibit 59.

e) In violation of the law and the procedures of the Ethics Commission, DeCaires has repeatedly informed persons who were not associated with her investigation that she was investigating the plaintiffs, and made knowingly false statement regarding the results of said investigations. All such matters, even if true, were confidential matters and it was illegal and improper for DeCaires to disclose such information.  DeCaires' knowingly violated the confidentiality requirements of the  law in order to give more weight to the knowingly false statements made about the results of her

bogus investigations.  Such false statements were made to fellow

workers and colleagues of the adult plaintiffs, and to school

administrators, security officials and staff of the school attended by

the minor plaintiff, all to plaintiffs' damage and prejudice, Exhibits

42, 46, 62, 72.

f)   Totto provided confidential information about his ethics

investigations of plaintiffs to other County officials.  Such

confidential information, illegally provided to other County officials,

included false information negatively affecting the plaintiffs, Exhibit

48.

g)   The actions of Totto and/or DeCaires violated specific provisions of

the applicable laws, including but not limited to a prohibition against

disclosing confidential information gained by reason of their office

or position or use of such information for the personal gain or

benefit of anyone, and a proscription that all files, records, reports,

writings, documents, exhibits, electronic records and other

information prepared or received by the commission or its staff or

consultants shall be held in confidence and no information as to the

contents thereof shall be disclosed.

h)   In conducting interviews of witnesses, DeCaires and Totto made

knowingly false statements about matters which, even if true, they

were legally required to keep confidential, Exhibit 42.

102.   Totto knew, and admitted knowing, that a person would be specifically notified if the person became a target of an ethics commission investigation.  Despite this, defendants knowingly and recklessly, in violation of the law and their own procedures, commenced a number of investigations in which plaintiffs were the target of said investigations, without notifying plaintiffs of the same, except, perhaps, through media leaks, Exhibits 73, 68.

103.   Totto and DeCaires, as officers of the City agency investigating ethical violations, knowingly provided confidential information about their investigation to the federal public defender, causing the public defender to subpoena investigative files about which he would otherwise have had no knowledge but for the improper disclosures by DeCaires and Totto.  Exhibit 51.

104.   Thereafter, they caused confidential Ethics Commission files, including information which they fabricated, to be provided to the Federal Bureau of Investigation, triggering a federal investigation which included federal subpoenas for information and witnesses who were already part of the investigations being conducted by Totto and DeCaires.  Exhibit 45.

105.   Totto and/or DeCaires also improperly leaked this information to the news media.  Exhibit 52

106.   The morning after a specific Hawaii News Now "Exclusive" story about adult plaintiff's being subjects of an ethics investigation, minor plaintiff was verbally tormented by several students.  The incident culminated with the minor plaintiff being physically assaulted by these students and her personal property was later stolen and destroyed by these same individuals.  This happened on multiple occasions.  She has

suffered damages, including but not limited to lower grades, loss of friends and social esteem, severe anxiety, emotional distress, loss of educational and economic opportunities.  Exhibits 53-55.

107.   As a result of the defendants' illegal and improper actions, the minor plaintiff was bullied at school, harassed via various forms of social media, humiliated amongst peers and the general public, and was ultimately forced to transfer to another school.

## ETHICAL LAPSES BY DEFENDANTS TOTTO AND DECAIRES

108.   Totto and/or DeCaires are themselves now the subject of eight substantive ethics complaints filed with the Ethics Commission alleging conduct which is not only unethical, but potentially illegal, filed by Plaintiff Katherine Kealoha and others. The subject of such ethics complaints include:

   a.  Misuse of City Resources

   b.  Preferential and unequal treatment

   c.  Misuse of City Seal and City Logo

   d.  Misuse of City Letterhead for non-official use.

   e.  Misuse of his position for personal benefit

   f.  Improper and unauthorized leaks of confidential information

   g.  Failure to file public financial disclosures

109.   Further, Totto misused his position and authority in an attempt to leverage the ethics complaint he filed against plaintiffs to obtain a personal and improper advantage with respect to the many ethics complaints made against him by plaintiff Katherine Kealoha.

110.   While disqualified from the matter and prohibited from accessing the matter, Totto misused his position to obtain confidential transcripts of the executive sessions of the Ethics Commission on a matter involving the plaintiffs, and then attempted to leverage for his personal benefit the information thereby obtained. For this, Totto was chastised and punished by the Ethics Commission.

111.   Defendants Totto and DeCaires knowingly made false statements to the Ethics Commission in order to accomplish their goals. Such false statements include, but are not limited to:

a) In order to justify her investigation of plaintiff Louis Kealoha, DeCaires deliberately lied about previously conducting an investigation of him, when in fact, there was no prior investigation, and DeCaires had actually only interviewed plaintiff Louis Kealoha as a witness in an unrelated investigation in which he was not a subject of investigation.  Exhibits 62, 46

b) Totto alternatively lied about the scope and complexity of the investigation of the plaintiffs in order to obtain and continue funding, and later, under oath, attempted to downplay the investigation for the purpose of obtaining an advantage in pre-hearing motions. Exhibits 3, 5, 30.

112.   An independent investigator has been appointed by the Ethics Commission to investigate the complaints filed against Totto/DeCaires.  Plaintiffs expect that Totto and DeCaires will be investigated with the same vigor that they themselves performed of County personnel other than their friends, that they will be prosecuted for

their unethical and illegal actions, and that they will be subject to the same or similar

fines and penalties as have been imposed on other County personnel (other than their

friends) for similar serious violations of the Standards of Conduct.

113. Defendant DeCaries is no longer an investigator with the Ethics

Commission and her contract with the Ethics Commission is not expected to be

renewed.

114. Totto is expected to resign and/or be terminated from the Ethics

Commission imminently, and/or within days.

### DAMAGE TO PLAINTIFFS' PROSPECTIVE BUSINESS OPPORTUNITIES WITH A SOLAR COMPANY

115. In May, 2014, plaintiff, along with an officer with the Honolulu Police

Department, and a third person, Katherine Kealoha formed a company called Discount

Energy Solutions, LLC, for the purpose of engaging in residential and commercial

photovoltaic and solar installation.  Exhibits 27, 64, 69.

116. Before entering into any business dealings involving the new company,

plaintiff Katherine Kealoha wrote to Totto, with a Request for Advice, pursuant to the

stated procedures of the Ethics Commission, seeking an opinion as to whether it was

permissible to engage in such outside employment.    Exhibits 27, 68, 71, 73.

117. Totto failed, neglected, and/or refused to timely respond to the Request for

Advice.  As a result, Plaintiff Katherine Kealoha  did not engage in any business with

Discount Energy Solutions, and withdrew from the new company.  Shortly thereafter,

the HPD officer also withdrew from the company without doing any business.  By May

2015, only the third person remained associated with the company.    Exhibits 27, 64,

68.

118.   As a result of Totto's negligent or intentional failures, Totto has effectively damaged plaintiff's prospective business opportunities and caused damage to plaintiffs.

## OTHER DAMAGES AND CLAIMS

119.   Defendants intentionally and/or negligently inflicted emotional distress upon plaintiffs.

120.   Defendants' actions have been outrageous and beyond the bounds of human decency.

121.   As a result of the defendants' actions, plaintiffs have been damaged in professional and personal reputations

122.   As a result of the defendants' actions, plaintiff Louis Kealoha suffered damage to his  command.

123.   As a result of the defendants' actions, plaintiff Louis Kealoha suffered damage to his prospective economic opportunities.

124.   As a result of the defendants' actions, plaintiff Katherine Kealoha' has been damaged in her ability to perform her job.

125.   As a result of the defendants' actions, Katherine Kealoha suffered damage to her prospective economic opportunities.

126.   As a result of the defendants' actions, the minor plaintiff has been damaged in her ability to study and perform effectively at school. She has been taunted, bullied and humiliated by her schoolmates following the leaks and false information propagated by defendants.

127.   As a result of the defendants' actions, the minor plaintiff suffered damage to her prospective economic opportunities.

128.   The false statements made by defendants were defamatory and defamatory per se.

129.   Plaintiffs have been damaged by the actions of defendants, including:

    a)  Bodily injury

    b)  Emotional Distress

    c)  Economic damage

    d)  Loss of economic opportunity

    e)  Loss of future educational and economic opportunity (child)

    f)  Attorney's fees and costs

    g)  Other damages to be proven.

108.   Defendants wrongfully, willfully and/or negligently performed their investigation, subjecting them to liability under *Tseu, State ex rel. Hobbs v. Jeyte*, 88 Hawai'i 85, 962 P.2d 344 (1998).

109.   Defendants caused plaintiffs to be damaged by the negligent hiring/re-hiring and employment/continued employment of Totto and DeCaires.

110.   Furthermore, by their wrongful actions, Totto and DeCaires caused plaintiffs to be embroiled in litigation and/or adverse actions with other state and federal agencies, entitling plaintiffs to relief, including relief under *Uyemura v. Wick*, 551 P.2d 171 (1976).

WHEREFOR, Plaintiffs pray as follows:

A.   For an award of general and special damages, jointly and severally, against each defendant;

B.      For a substantial award of punitive damages consistent with the outrageous, reckless, and intentional conduct of the defendants.

C.      For an award of their attorney's fees and costs;

D.      For Declaratory relief, determining that the process and procedures of the Ethics Commission in instigating investigations and prosecuting violations of the Standards of Conduct are in violation of the law, and to determine the proper procedures as described in the applicable statutes and rules;

E.      For injunctive relief, requiring the Ethics Commission and defendants to comply with the law and the required procedures for instituting investigations and prosecuting violations of the Standards of Conduct;

F.      For such other and further relief as to this Court seems just and proper.

DATED:    HONOLULU, HAWAII,    June 16 2016.

_____
KEVIN P. H. SUMIDA
ANTHONY L. WONG
LANCE S. AU
STEPHEN K. ROY
Attorneys for Plaintiffs

<u>VERIFICATION</u>

STATE OF HAWAII )
                : SS.
CITY AND COUNTY OF HONOLULU )

      KATHERINE E. KEALOHA, being first duly sworn, on oath, deposes and says that she is

the plaintiff named above, that she has read contents of the Verified Complaint, and its exhibits, and that

the same are true and correct to the best of her knowledge and belief.

 

KATHERINE E. KEALOHA

Subscribed and sworn to before me
this 16th day of June , 2016.

Notary Public, State of Hawaii

Kristine H. Nekomoto
Printed Name

My commission expires: _____ 4/9/18 2018

| Doc. Date: 6/16/16 | # Pages: 1,114 |
| --- | --- |
| Name: KRISTINE H. NEKOMOTO | |
| Doc Description: Verified Complaint for | First Circuit |
| Damages, Declaratory & Injunctive Relief | |
| Signature   6/16/16 | |
| Signature       Date | |

N O T A R Y   C E R T I F I C A T I O N